kaw

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MIDWEST CONCRETE PLACEMENT, INC.,** ) | |
| ) | |
| **Third Party Plaintiff,** ) | |
| **vs.** ) | **Case No.  07-2316-JAR** |
| ) | |
| ) | |
| **L&S BASEMENTS, INC.,** ) | |
| ) | |
| **Third Party Defendant.** ) | |
| _____) | |

### MEMORANDUM AND ORDER

This is a contract action for indemnification arising from an accident that took place on February 8, 2006, in which plaintiff James Beard was severely injured.  Before the Court are third party defendant L&S Basements, Incorporated's ("L&S") Motion for Summary Judgment (Doc. 81) and third party plaintiff Midwest Concrete Placement, Incorporated's ("Midwest") Motion for Summary Judgment (Doc. 83).  L&S moves for summary judgment on three grounds: (1) there is no enforceable contract for indemnification between the parties; (2) if there is a contract, it is void, unconscionable, or unenforceable based on public policy; and (3) the indemnification provision is unclear and equivocal.  Midwest moves for summary judgment, arguing that there is an enforceable contract between the parties and the indemnification provision is enforceable and specific.  The Court has considered the parties' briefs and is ready to rule.  For the reasons below, L&S's motion is denied, and Midwest's motion is granted.

### UNCONTROVERTED FACTS

The following facts are uncontroverted.  Plaintiffs James and Diane Beard brought an action against  Midwest for its alleged negligence in failing to properly maintain its equipment.

As a result, James Beard was severely injured when a hose used to pump concrete ruptured and propelled concrete at his neck, back, and head.  Midwest settled the claims with the Beards for $550,000.00.  Midwest then brought a third party claim against L&S, claiming that L&S must indemnify it for any claims based on its contractual arrangement.

L&S is in the business of pouring concrete for basement walls and footings.  On any given project, L&S would purchase cement from a supplier, such as Penny's Concrete, Inc., the company James Beard worked for at the time of the accident.  L&S does not operate its own cement or concrete pump trucks, but rents concrete pump trucks as needed from Midwest, a company in the business of leasing concrete pumping equipment to other contractors for the placement of concrete.  Midwest does not provide the concrete, merely the equipment to pour the concrete.

When L&S needed a pump truck, it would contact Midwest and make arrangements for a truck to arrive at the work site at a specified time.  Maintenance of the trucks was the sole responsibility of Midwest and while on a job site, the trucks would be operated by an employee of Midwest.  Once arrangements were made for a truck to come to a specified site, a Midwest employee would meet the lessee at the job site with, for lack of a better term, a job ticket.  Once the Midwest employee completed the task assigned, he would require the lessee to sign the job ticket signifying that the job had been completed as requested.  After the Midwest employee completed the job and obtained the lessee's signature on the job ticket, another Midwest employee at Midwest's office would complete an invoice of that transaction.

On the front of the job ticket is general information about the particular tasked performed; and a single paragraph entitled "TERMS AND DISCLOSURE STATEMENT."

2

Immediately below that paragraph and immediately above the signature line on the front of the

job ticket, in the same font size, if not smaller, is this language:  "Terms & Conditions governing

this rental as described on the reverse side are understood and agreed to by" the customer.

Below the signature line in much smaller font is this language: "STANDARD SHORT TERM

RENTAL CONTRACT. TERMS & CONDITIONS ON REVERSE."  On the reverse side of the

job ticket are the terms and conditions, including the following:

> INDEMNIFICATION AND RISK OF LOSS: Customer and Midwest
> Concrete Placement, Inc. agree that the equipment and all persons
> operating such equipment including Midwest Concrete Placement
> Inc.'s employees will be under customer's exclusive jurisdiction,
> supervision, and control during the time such equipment and
> operators are on Customer's job site: the Customer agrees to
> indemnify Midwest Concrete Placement, Inc. against all claims,
> actions, proceedings, costs, damages, and liabilities arising in any
> manner out of, connected with, or resulting from the operation or
> handling of the equipment on Customer's job site including
> without limitation any injury, liability or death of workman or
> other persons and any loss or damage to property whether the
> liability, loss or damage is caused by or arises out of the
> negligence of Midwest Concrete Placement, Inc. employees or
> otherwise.  Customer's duty to indemnify shall include all costs or
> expenses arising out of or connected with all claims specified
> herein, including all court and or arbitration costs, filing fees,
> attorney's fees and costs of settlement and Customer further agrees
> to indemnify Midwest Concrete Placement, Inc. against all loss of
> or damage to the equipment which occurs while said equipment is
> on Customer's job site.

On February 8, 2006, pump truck number 422 arrived at the job site at approximately

9:45 a.m.  Written on the job ticket for pump truck number 422 is "Blew pipe on job did not

finish."  At approximately 1:00 p.m., pump truck number 461 arrived.  Written on that job ticket

is "Had to finish job for 422 (blew pipe)."  Pump truck 461 left the job site at approximately 3:45

p.m.  The job ticket for pump truck 461 is signed "Andy."  L&S, however, denies that its

employee, Andy Jessip, signed the job ticket.

## SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[2]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[3]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[5]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[6]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[7]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of

---

[1]Fed. R. Civ. P. 56(c).

[2]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[3]*Id.*

[4]*Id.* at 251–52.

[5]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[6]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[7]*Id.*

trial from which a rational trier of fact could find for the nonmovant."[8]  If the moving party bears

the burden of proof at trial, "it must point to evidence in the record that supports its version of all

material facts and demonstrate an absence of a genuine issue of material facts."[9]  "If the moving

party does not meet this burden, the court must deny summary judgment even if the nonmoving

party does not produce any opposing evidence."[10]  If the moving party does meet its burden, the

nonmoving party must offer more than mere allegations and denials to create a genuine issue of

material fact.[11]  When examining the underlying facts of the case, the Court is cognizant that it

may not make credibility determinations or weigh the evidence.[12]  "Where, as here, the parties

file cross motions for summary judgement, [the court is] entitled to assume that no evidence

needs to be considered other than that filed by the parties, but summary judgment is nevertheless

inappropriate if disputes remain as to material facts."[13]

<u>**DISCUSSION**</u>

A.    <u>*Meeting of the Minds*</u>

L&S's first ground for summary judgment is that there was never a contract between the

parties because there was never a meeting of the minds on all the essential terms of the

agreement.  Midwest asserts that there was a contract between the parties because an agent for

---

[8]*Id.*

[9]*Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting).

[10]*Id.*

[11]*Id.*

[12]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[13]*James Barlow Family Ltd. P'ship* v. *David Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citations omitted).

L&S signed the agreement and even if the signature on the job ticket is disregarded, L&S

assented to the terms of the agreement by accepting performance and paying for the services.

For there to be a binding contract, there must be a meeting of the minds on all the

essential terms of the agreement.[14]  "'To constitute a meeting of the minds there must be a fair

understanding between the parties which normally accompanies mutual consent and the evidence

must show with reasonable definiteness that the minds of the parties met upon the same matter

and agreed upon the terms of the contract.'"[15]  In *Navair v. IFR Americas, Inc.*,[16] the Tenth

Circuit stated:

> The element of agreement is sometimes referred to as a "meeting
> of the minds."  The parties to most contracts give actual as well as
> apparent assent, but it is clear that a mental reservation of a party
> to a bargain does not impair the obligation he purports to
> undertake.  The phrase used here, therefore, is "manifestation of
> mutual assent."[17]

The Court further stated that "[t]ypically, judicial opinions stating the meeting-of-the-minds

principle then point to objective communications and conduct in resolving the case."[18]  In this

case, the uncontroverted facts point to an agreement between the parties.

All "contracting parties have a duty to learn the contents of a written contract before

signing it, and such duty includes reading the contract and obtaining an explanation of its

---

[14]*Steele v. Harrison*, 552 P.2d 957, 962 (Kan. 1976).

[15]*Price v. Grimes*, 677 P.2d 969, 974 (Kan. 1984) (quoting *Steele*, 552 P.2d at 962).

[16]519 F.3d 1131 (10th Cir. 2008).

[17]*Id*. at 1139 (quoting RICHARD A. LORD, WILLISTON ON CONTRACTS § 4:1 (4th ed. 2007)).

[18]*Id*.

terms."[19]  "[A] party who signs a written contract is bound by its provisions" absent fraud, undue

influence, or mutual mistake.[20]  Here the job ticket purports to have Jessip's signature on it.  But

even if the signature is not Jessip's, the Court still finds that there was a meeting of the minds,

for a party can assent to a contract even if it does not sign the agreement.

For example, in *Crouch v. Marrs*,[21] the Kansas Supreme Court stated the axiomatic rule

that an offer can be accepted by an affirmative act, by silence, or by refraining from some act.[22]

In that case, Crouch sought to purchase property from Marrs.  Crouch sent Marrs a check for the

offered amount and Marrs deposited the check but later argued that there was never an

acceptance.  The Court reasoned that "endorsing and depositing a check constitutes an

acceptance of the offer to buy which accompanies it because the act itself indicates

acceptance."[23]  The same can be said here, where L&S paid for the services after two pump

trucks were required to complete the job.[24]

L&S's next contention is that there is no contract between the parties because of the

unusual process in which Midwest and L&S conducted business.  According to L&S, an

employer of Midwest would arrive at each job site with a job ticket and that job ticket would not

be signed until after completion of the job.  Again, even if that were the case, L&S subsequently

---

[19]*Albers v. Nelson*, 809 P.2d 1194, 1197 (Kan. 1991) (citation omitted).

[20]*Id.* (citations omitted).  L&S has not alleged any fraud, only that an agent of L&S did not sign the agreement.

[21]430 P.2d 204 (Kan. 1967).

[22]*Id.* at 209.

[23]*Id.*

[24]*See also Prince Enter., Inc. v. Griffith Oil Co. Inc.*, 664 P.2d 877, 882 (Kan. Ct. App. 1983) (finding that accepting a check was acceptance of a term of renewal of a lease).

accepted the performance of the services by paying the fee charged for those services.

Finally, L&S argues that there was no meeting of the minds because L&S was not aware of the indemnification provision in the agreement.  In Kansas, however, the law is that a party to a contract is presumed to have read and understand the terms of that contract.[25]  Not reading the agreement is no basis for L&S to escape its obligations under the contract.  Moreover, the parties had an ongoing business relationship based on renting cement equipment and trucks.[26]  Thus, even if L&S did not know of the indemnification provision, it should have, considering the numerous occasions on which it rented from Midwest.

B.    *Unconscionability*

L&S's contends that the indemnification provision is void, unconscionable, and against public policy under Kansas law.  "'The policy of law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced.'"[27]  "'Contracts freely arrived at and fairly made are favorites of the law.'"[28]  This general principle applies unless the contract is illegal, contrary to public policy, or derived from fraud, mistake, or duress.[29]  A party's failure to read the contract is no defense nor is arguing that the contract terms are disadvantageous.[30]  When interpreting exculpatory

---

[25]*Albers v. Nelson*, 809 P.2d 1194, 1197 (Kan. 1991).

[26]*See Willie v. Southwestern Bell Tel. Co.*, 549 P.2d 903, 910 (Kan. 1976).

[27]*Estate of Bryant v. All Temperature Insulation, Inc., et. al.*, 916 P.2d 1294, 1298 (Kan. Ct. App. 1996) (quoting *Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.*, 535 P.2d 419, 424 (Kan. 1975)).

[28]*Id.* (quoting *Kansas City Structural Steel Co.*, 535 P.2d at 424).

[29]*John Deere Leasing Co. v. Blubaugh*, 636 F. Supp. 1569, 1572 (D. Kan. 1986).

[30]*Id.*

8

contracts, which are strictly construed against the party relying on them,[31] courts have routinely

upheld such contracts where they are not against public policy, unconscionable, or a result of

overreaching.[32]

The leading case on unconscionability in Kansas is *Willie v. Southwestern Bell Telephone*

*Co.*[33]  In *Willie*, the Kansas Supreme Court found the following factors relevant to whether a

contract was unconscionable:

> The use of pinted (sic) form or boilerplate contracts drawn
> skillfully by the party in the strongest economic position, which
> establish industry wide standards offered on a take it or leave it
> basis to the party in a weaker economic position; (2) a significant
> cost-price disparity or excessive price; (3) a denial of basic rights
> and remedies to a buyer of consumer goods; (4) the inclusion of
> penalty clauses; (5) the circumstances surrounding the execution of
> the contract, including its commercial setting, its purpose and
> actual effect; (6) the hiding of clauses which are disadvantageous
> to one party in a mass of fine print trivia or in places which are
> inconspicuous to the party signing the contract; (7) phrasing
> clauses in language that is incomprehensible to a layman or that
> divert his attention from the problems raised by them or the rights
> given up through them; (8) an overall imbalance in the obligations
> and rights imposed by the bargain; (9) exploitation of the
> underprivileged, unsophisticated, uneducated and the illiterate; and
> (10) inequality of bargaining or economic power.[34]

In *Willie*, the court determined that the limitation of liability clause was not

unconscionable, although the signature lines were on the front of the contract and the limitation

of liability clause was on the back side of the page.  The Court noted that the front of the contract

---

[31]*Hunter v. Am. Rentals*, 371 P.2d 131, 133 (Kan. 1967).

[32]*Corral v. Rollins Protective Servs. Co.*, 732 P.2d 1260, 1263 (Kan. 1987).

[33]549 P.2d 903 (Kan. 1976).

[34]*Id.* at 906-07 (citations omitted).

9

stated that additional terms and conditions were on the reverse side and in conspicuous font at the bottom informed the signatory to refer to the conditions on the back.  Furthermore, the Court determined that Willie was an experienced business man and that he was styled in the ways of printed form contracts.[35]

The same can be said about the job ticket in this case.  The front of the job ticket includes language referring the signatory to the reverse side for additional terms; and below the signature line is more language referring the signatory to the reverse side for additional contract terms.  And although the writing is not in large or conspicuous font, there is only one paragraph, consisting of nine lines, on the front of the job ticket and that single paragraph is labeled "TERMS AND DISCLOSURE STATEMENT."  There is no extreme fine print, no hidden information, nor incomprehensible legalese.  Moreover, like Willie, L&S contracted with Midwest on numerous occasions, using the same procedures and processes.  And while L&S claims that no one read the information on the job ticket or that no one from Midwest referred L&S's agent to the information on the back of the job ticket, failing to read a contract does not entitle one to renege on one's obligations.

C.      _Public Policy_

L&S cites to _Belger Cartage Service, Inc. v. Holland Construction Co._[36] for the proposition that the indemnification clause is against public policy.  In _Belger_, the Kansas Supreme Court agreed with the trial court that an exculpatory clause was unenforceable as

---

[35]_Id._ at 910-11.

[36]582 P.2d 1111 (Kan. 1978).

10

against public policy.[37]  Holland rented a crane from Belger to complete work on a job site.  The

crane arrived on the morning of the task and was operated by two Belger employees.  The

employees also brought with them the work order, which had printed on the reverse side, the

terms of the contract.  One term read:

> 8. It is agreed and understood that any equipment, or any item
> which may be delivered, is brought upon or delivered to lessee's
> premises (including any premises where lessee is engaged in work
> on account of or in connection with which this work order was
> issued) at the sole risk of the lessee. It is further agreed and
> understood that any work performed on such premises is
> performed at the sole risk of the lessee. With regard to such
> equipment or deliveries or work performed, Belger Cartage
> Service, Inc. is hereby relieved from any and all responsibility
> regardless of its own fault or negligence. Belger Cartage Service,
> Inc. is further relieved of any responsibility whatsoever for damage
> to any curb, sidewalk, drive, lawn or appurtenance adjacent to the
> said premises. In connection with any claims made against Belger
> Cartage Service, Inc. arising out of deliveries made, equipment
> furnished or work done in connection with this work order, the
> lessee hereby indemnifies Belger Cartage Service, Inc. in full
> (including attorney's fees). This indemnity to Belger Cartage
> Service, Inc. shall extend to and include any and all injuries to
> persons and any and all damage to property which may occur on
> account of the negligence of Belger Cartage Service, Inc.[38]

While operating the crane, the cable broke and caused damage to the crane as well as to

Holland's property.  Belger sought indemnification based on the indemnification provision.

The Kansas Supreme Court stated that when determining the enforceability of

exculpatory agreements, the courts may consider the totality of the circumstances surrounding

the execution and performance of the contract including, but not limited to, whether the other

party had knowledge of the contract terms either by having them pointed out to him or by

---

[37]*Id*. at 1120.

[38]*Id*. at 1116.

11

conspicuous writing in the contract describing the terms.[39]  The Court concluded that the clause was unenforceable because Belger did not inform Holland that the clause was on the back of the work order, and there was no evidence that Holland knew about the clauses on the reverse side of the work order.  Additionally, the language was not conspicuous; in fact, it was in small print and all other personalized information was on the front of the work order, including the signature line.[40]

While at first blush *Belger* appears similar, there are a several distinctions in this case.  First, there is no indication in *Belger* that the front side of the work order notified the signatory of the conditions on the back.  Here, however, there is only one paragraph on the front of the job ticket.  Yet twice, once immediately above and once below the signature line, the signatory is notified to refer to terms and conditions on the back of the ticket.  Second, the indemnification provision on the back of the job ticket is clear and unambiguous and is written in plain language, not hidden nor lost in a haze of small print and legalese.  Furthermore, the indemnification provision is conspicuously labeled and easily identified on the reverse side of the job ticket.

In fact, this case is more similar to *Ki Ron Ko v. Bally Total Fitness Corp.*, where the district court determined that a clause limiting liability was not against Kansas public policy.[41]  In that case, plaintiff purchased a Bally's membership from another patron.  Plaintiff was given the card to access the gym and the contract, both of which he never read.  The contract provided:

> 10. WAIVER AND RELEASE You (Buyer, each Member and all guests) agree that if you engage in any physical exercise or activity or use any club facility on the premises, you do so at your own

---

[39]*Id*. at 1120.

[40]*Id.*

[41]No. 02-2360, 2003 WL 22466193, at *3 (D. Kan. Sept. 16, 2003).

risk. This includes, without limitation, your use of the locker room, pool, whirlpool, sauna, steamroom, parking area, sidewalk or any equipment in the club facility and your participation in any activity, class, program or instruction. You agree that you are voluntarily participating in these activities and using these facilities and premises and assume all risk of injury, illness, damage or loss to you or your property that might result, including, without limitation, any loss or theft of any personal property. You agree on behalf of yourself (and your personal representatives, heirs, executors, administrators, agents and assigns) to release and discharge us (and our affiliates, employees, agents, representatives, successors and assigns) from any and all claims or causes of action (known or unknown) arising out of our negligence. This Waiver and Release of liability includes, without limitation, injuries which may occur as a result of (a) your use of any exercise equipment or facilities which may malfunction or break, (b) our improper maintenance of any exercise equipment or facilities, (c) our negligent instruction or supervision, and (d) you slipping and falling while in the facility or on the premises. You acknowledge that you have carefully read this Waiver and Release and fully understand that it is a release of liability. You are waiving any right that you may have to bring a legal action to assert a claim against us for our negligence.[42]

This same waiver and release is also referenced on page one of the contract.

When plaintiff assumed membership he was given a temporary card and subsequently a permanent card that contained the following language on the back of the card: "Use of card or club acknowledges agreement to comply with current club rules and written membership contract, including but not limited to the waiver and release of liability from any and all claims or causes of action arising out of our negligence for personal injury or theft of property."[43] When plaintiff was injured in the steam room of the facility, he sued.

Noting that under Kansas law, a party may contract away responsibility for its own

---

[42]*Id.* at *1.

[43]*Id.* at *2.

negligence, but only when done in a clear and unequivocal manner, the district court concluded that plaintiff's failure to read the agreement was not an excuse for failing to comply with the agreement.[44]   Additionally, the district court distinguished *Belger*, finding that the clause in this case was conspicuously labeled and there was ample notice to plaintiff that he was subject to the limitation of liability clause in the installment contract.[45]

Just as Ki Ron Ko was given notice of the clause in the contract, L&S was given notice of the clause twice on the front of the job ticket.  Moreover, L&S, on more than one occasion, used the services of Midwest; therefore, it was familiar with the job ticket just as Ki Ron Ro was familiar with his membership card.  Hence, as in *Ki Ron Ko*, failure to read the job ticket is no excuse for not complying with the provisions on the back of the job ticket.  The clause on the reverse side of the job ticket is conspicuously labeled and sufficiently declares the rights of the parties.  Accordingly, the Court finds that the indemnification clause is not invalid as against public policy.

Next, L&S argues that the indemnification provision is unenforceable because it is against public policy as expressed in K.S.A. § 16-121(b).  That section provides that "[a]n indemnification provision in a contract which requires the promissor to indemnify the promissee for the promissee's negligence or intentional acts or omissions is against public policy and is void and unenforceable."[46]   The term contract is defined in § 121(a)(2) as a "construction contract."  Section 121(a)(1) defines construction contracts as:

> an agreement for the design, construction, alteration, renovation,

---

[44]*Id.* at *3.

[45]*Id.*

[46]K.S.A. § 16-121(b).

> repair or maintenance of a building, structure, highway, road,
> bridge, water line, sewer line, oil line, gas line, appurtenance or
> other improvement to real property, including any moving,
> demolition or excavation, except that no deed, lease, easement,
> license or other instrument granting an interest in or the right to
> possess property shall be deemed to be a construction contract
> even if the instrument includes the right to design, construct, alter,
> renovate, repair or maintain improvements on such real property.

In the case at bar, the contract under scrutiny is a rental contract and does not fall under

K.S.A. § 16-121(b).  Accordingly, that argument also misses the mark.

D.      *The Indemnification Provision is Clear and Unequivocal*

Finally, L&S makes a cursory argument that the indemnification provision does not

contemplate that L&S would be liable for Midwest's failure to maintain its equipment.

Although L&S cites no authority in this section of its brief the Court nonetheless will address

this contention.  "Under Kansas law, agreements in which one party agrees to indemnify another

for the indemnitee's own negligence are disfavored and as such must be expressed in 'clear and

unequivocal language.'"[47]  "'The general rule is that private contracts exculpating one from the

consequences of his own acts are looked upon with disfavor by the courts and will be enforced

only when there is no vast disparity in the bargaining power between the parties and the

intention to do so is expressed in clear and unequivocal language.'"[48]  However, "so long as

'[n]one of the parties . . . involved were neophytes or babes in the brambles of the business

world,' the court will eschew declaring that voluntarily entered-into indemnification agreements

---

[47] *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1062 (10th Cir. 1998) (quoting *Zenda Grain & Supply Co. v. Farmland Indus., Inc.*, 894 P.2d 881, 887 (Kan. 1995)).

[48] *Id.* (quoting *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 582 P.2d 1111, 1119 (Kan. 1978)).

void."[49]  In this case, neither L&S nor Midwest are babes in the brambles of the business world.

Both parties have entered into numerous equipment lease agreements and in fact, have worked

with each other repeatedly over the years.  Thus, the only remaining issue is whether the

indemnification provision provided in clear and unequivocal language that L&S would be liable

for Midwest's failure to maintain its equipment.

In deciphering this particular contract term, the issue is whether the parties intended for

the indemnification provision to cover the specific facts here.  Broad and all-inclusive language

in an indemnification provision is not enough to overcome the judicial disfavor the courts have

for such provisions.[50]  Rather, parties must ensure that when drafting indemnification provisions,

they address specifically the thing the clause seeks to encompass.[51]  The clause at issue is quite

specific on its face and clear and unambiguous.  Its relevant portion provides that "[L&S] agrees

to indemnify [Midwest] against all claims . . . arising in any manner out of, connected with, or

resulting from the operation or handling of the equipment on [L&S's] job site . . . whether . . .

caused by . . . negligence of [Midwest]."  A reading of the clause expresses that L&S agrees to

indemnify Midwest for any claim that arises from the *operation or handling* of the equipment on

the job site.  The word "operation" connotes that L&S can be held liable for the failure of

Midwest to maintain its equipment, because the equipment was operated on L&S's  job site.

L&S's argument is premised on the idea that the negligent act took place before the pump

truck reached the job site—that is, Midwest failed to maintain its pump truck in functioning

---

[49]*Id*. (quoting *Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc*., 535 P.2d 419, 424 (Kan. 1975)).

[50]*Id*. at 1063 (citing *Zenda Grain & Supply Co.*, 894 P.2d at 887).

[51]*Id*.

order prior to sending it to the job site.  That contention, however, is amply covered by the

indemnification provision, as a ruptured pump is the failure of the truck to operate correctly and

that ruptured pump lead to the cement catapulting into the body of James Beard.  Accordingly,

the indemnification provision is clear and unequivocal in its wording, leaving only the

conclusion that L&S agreed to indemnify Midwest for the action brought against it by James

Beard.

Having found that there is a contract and the indemnification provision is enforceable,

Midwest's motion for summary judgment is granted and L&S's motion is denied.

**IT IS THEREFORE ORDERED THAT** L&S's Motion for Summary Judgment (Doc.

81) is Denied, and Midwest's Motion for Summary Judgment (Doc. 83) is Granted.

**IT IS SO ORDERED.**

Dated:  <u>April 29, 2009</u>

       S/ Julie A. Robinson           
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE